**SOLITRON DEVICES, INC.,**
**Plaintiff-Appellee,**
**Cross-Appellant,**

v.

**HONEYWELL, INC.,**
**Defendant-Appellant,**
**Cross-Appellee.**

No. 86–5793.

United States Court of Appeals,
Eleventh Circuit.

April 12, 1988.

David V. Anthony, Pettit & Martin, Paul C. Fuener, Washington, D.C., for Solitron Devices, Inc.

David A. York, Latham & Watkins, Chicago, Ill., James M. Tuthill, Christianson, Jacknin & Tuthill, West Palm Beach, Fla., for Honeywell, Inc.

Before TJOFLAT and ANDERSON, Circuit Judges, and ROETTGER [*], District Judge.

TJOFLAT, Circuit Judge:

In this diversity case, we must interpret an agreement between a government contractor and a subcontractor. We conclude that the district court misinterpreted a release in the agreement and consequently erred in granting the subcontractor summary judgment on the contractor's counterclaim. We affirm the district court in all other respects.

[*] Honorable Norman C. Roettger, Jr., U.S. District Judge for the Southern District of Florida, sitting by designation.

## I.

In October 1978 Honeywell, Inc., a Delaware corporation, entered into a contract with the National Security Agency (NSA) pursuant to which Honeywell agreed to deliver to NSA certain cryptographic equipment. Honeywell then entered into a subcontract with Solitron, Inc., a New York corporation, for the delivery of hybrid microcircuits Honeywell needed in the production of the cryptographic equipment. The subcontract provided that the microcircuits were to conform to specifications and drawings supplied by NSA.

NSA sent the specifications to Honeywell, and Honeywell passed them on to Solitron. In July 1982 Solitron notified Honeywell that the NSA-supplied specifications had proven defective. Solitron advised Honeywell that it had incurred extra costs because of the defective specifications and that it intended to submit a claim for reimbursement.

Honeywell and Solitron concluded that the best way to handle Solitron's claim would be for Solitron to negotiate directly with NSA, the source of the defective specifications. Solitron, however, was not in privity of contract with NSA. Honeywell and Solitron therefore entered into a contract (the "Sponsorship Agreement") in September 1982 authorizing Solitron to pursue the claim against NSA in Honeywell's name. Under the terms of the Sponsorship Agreement, Solitron was to negotiate directly with NSA. Any settlement by NSA would be paid to Honeywell, and Honeywell would transfer the payment to Solitron. The Sponsorship Agreement contained mutual release clauses whereby Honeywell and Solitron each released the other from "all liabilities, obligations, claims, and demands whatsoever, known or unknown, incurred or anticipated, under or arising from the ... Subcontract or performance thereunder."

Approximately nineteen months passed before Solitron concluded negotiations with NSA. On May 9, 1984, Solitron and NSA signed a "Memorandum of Agreement" whereby NSA agreed to pay $575,000 in settlement of the defective specifications claim. NSA proceeded to make arrangements to have that amount transferred to Honeywell, with the understanding that Honeywell would then transfer the money to Solitron as specified by the Sponsorship Agreement.

Meanwhile, Solitron had fallen behind in its deliveries to Honeywell, and Honeywell had become increasingly dissatisfied with Solitron's performance of the subcontract. Solitron approached Honeywell in February 1984 with a request that the two parties reach some form of negotiated closeout of the subcontract. Honeywell agreed to meet with Solitron at the end of July to negotiate a mutually acceptable agreement of that nature. On July 27, 1984, however, Solitron wrote Honeywell a letter repudiating "all outstanding contractual obligations Solitron has to Honeywell." On the same day, Solitron filed a suit in the district court against Honeywell.[1]

Solitron's complaint contained two counts. In Count I, Solitron requested specific performance of the Sponsorship Agreement, alleging that Honeywell had received the $575,000 settlement from NSA and had refused to transfer it to Solitron. In Count II, Solitron requested $2,000,000 in damages under the subcontract, alleging that Honeywell had breached the subcontract by supplying Solitron with defective specifications.

Solitron moved the district court pursuant to Fed.R.Civ.P. 56 for summary judgment on Count I, and the court granted the motion.[2] Honeywell subsequently moved the court pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings as to Count II. In support of its motion, Honeywell argued that Solitron, having obtained specific performance of the Sponsorship Agreement's provision requiring Honeywell to pay over the NSA settlement, could not also recover under the subcontract on the very claim that was the subject matter of the settlement. The court agreed and granted

---

1. Solitron alleged jurisdiction under 28 U.S.C. § 1332 (1982) (diversity of citizenship).

2. Honeywell does not challenge that ruling in this appeal.

Honeywell's motion, emphasizing that the Sponsorship Agreement expressly released Honeywell from any liability in connection with Solitron's defective specifications claim.

Solitron then moved the court for summary judgment on a counterclaim Honeywell had filed. Honeywell's counterclaim alleged that Solitron had materially breached the subcontract in four ways: (1) by failing to make deliveries on schedule and by ceasing performance with over 95,000 microcircuits undelivered, (2) by delivering over 12,800 nonconforming microcircuits, (3) by failing to notify Honeywell when it commenced negotiations with NSA, as required by the Sponsorship Agreement, and (4) by repudiating the subcontract. The court granted Solitron's motion for summary judgment, holding that the counterclaim was barred by the release in the Sponsorship Agreement. Honeywell appeals this ruling, and Solitron cross appeals the court's order granting Honeywell judgment on the pleadings as to Count II.

## II.

We first address Honeywell's appeal of the district court's order granting Solitron summary judgment on Honeywell's counterclaim. Honeywell argues that the district court misinterpreted the scope of the general release contained in the Sponsorship Agreement. The disputed release reads as follows:

> Subject to the terms of this agreement ... [Honeywell] does hereby forever remise, release, and discharge [Solitron] of and from all liabilities, obligations, claims, and demands whatsoever, known or unknown, incurred or anticipated, under or arising from the above-described Subcontract or performance thereunder, provided however, that such remise, release, and discharge shall not become effective until [Solitron's] release of [Honeywell] under [the preceding paragraph] becomes effective.

The district court apparently interpreted the release as barring any claim by Honeywell that related to events occurring before Solitron and NSA concluded their settlement of the defective specifications claim. Under this interpretation, Honeywell's counterclaim would be barred because it related to alleged breaches by Solitron occurring before May 9, 1984, the date Solitron and NSA signed the "Memorandum of Agreement."

■ To determine the scope of a release, we look to the parties' intent as expressed in the contract. *See Alliance Oil & Refining Co. v. United States,* 13 Cl.Ct. 496 (1987).[3] The purpose of the Sponsorship Agreement was a narrow one: to facilitate the resolution of Solitron's defective specifications claim by enabling Solitron to negotiate directly with NSA. The parties expressly represented in the contract that all of the agreements set out therein were directed at achieving that specific end:

> [Solitron] desires to submit a claim for an upward equitable adjustment for the additional expenses it incurred in the performance of the Subcontract which expenses [Solitron] believes resulted from the [NSA's] actions. Such claims are to be presented to the [NSA] pursuant to the terms and conditions of the agreement set forth below.

This representation is followed by twenty-three numbered paragraphs. Paragraph 19 contains the release at issue here. We find no indication in the contract that paragraph 19 for some reason departs from the subject matter of the Sponsorship Agreement, namely, Solitron's pursuit of the defective specifications claim. We therefore must conclude that the parties' intent was for the release to apply solely to claims arising from Solitron's failure to perform as a result of the defective specifications. To read the release as applying to *any* claim by Honeywell against Solitron arising from their contractual relationship would

3. The parties specified in the subcontract that it was to "be construed and interpreted according to the Federal law of Government Contracts." We give effect to the parties' contractual choice

of law where, as here, doing so does not contravene public policy. *See Barzda v. Quality Courts Motel, Inc.,* 386 F.2d 417, 418 (5th Cir. 1967).

be to ignore the textual context in which the release appears.

■ We find that a genuine issue of material fact exists as to whether Honeywell's counterclaim falls within the scope of the release as we have defined it. With respect to each count in the counterclaim, Honeywell has introduced evidence giving rise to a factual inference that Solitron's alleged breach was at least partially due to matters unrelated to the defective specifications. The district court therefore erred in granting Solitron's motion for summary judgment on the basis of the release. *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985).

Solitron argues that even if summary judgment on the basis of the release was improper, the district court's ruling is sustainable on an alternative ground. Solitron's argument is that Honeywell's counterclaim is barred because Honeywell neglected to send a cure notice before filing the counterclaim. The subcontract contained a "default termination" clause pursuant to which Honeywell could terminate the contract on the ground that Solitron had defaulted, provided Honeywell first gave Solitron a ten-day cure notice. Solitron maintains that Honeywell sent it a notice of termination on September 11, 1984 without first sending a cure notice and is therefore barred from suing Solitron for any breaches it may have committed.

■ Of course, we must affirm the summary judgment if we find that the district court reached the right result notwithstanding its reliance on an incorrect ratio-

nale. *Williams v. City of Dothan*, 745 F.2d 1406, 1410 (11th Cir.1984). We are not persuaded by Solitron's alternative argument, however. By letter dated June 27, 1984, Solitron itself expressly repudiated the subcontract. Once Solitron had itself terminated the contract, a cure notice from Honeywell would have served no purpose. A default termination clause in a contract enables a party to terminate its own performance and bring suit against the breaching party. Where the contract has already been terminated by the party allegedly in breach, the suing party's compliance or lack of compliance with the termination clause is irrelevant. *See Appeal of Milo Werner Co.*, IBCA No. 1202–7–78, 82–1 B.C.A. (CCH) ¶ 15,698; *Mission Valve & Pump Co.*, ASBCA Nos. 13552, 13821, 69–2 B.C.A. (CCH) ¶ 8010.[4] We therefore conclude that Solitron's alternative argument for sustaining the district court's grant of summary judgment must fail.

## III.

■ We now turn to Solitron's cross appeal. As noted above, Solitron alleged in Count II of its complaint that Honeywell breached the subcontract by providing it with defective specifications. After the district court granted Solitron summary judgment on Count I of its complaint (specific performance of the Sponsorship Agreement), Honeywell moved for judgment on the pleadings as to Count II. The district court granted the motion, holding that Solitron, having obtained specific performance of the Sponsorship Agreement,

---

4. Solitron argues in its reply brief that the question is not simply whether the contract has already been terminated, but whether the contract has been terminated by a wrongful repudiation. According to Solitron, "the *only* time required cure notice provisions are excused is when there has been a *wrongful* anticipatory repudiation." Solitron argues that its June 27 repudiation was not wrongful and that Honeywell was therefore not excused from complying with the ten-day cure notice provision.

We fail to see the logic in the distinction Solitron attempts to draw. Solitron's June 27 letter unequivocally demonstrated that, as far as Solitron was concerned, its contractual relationship with Honeywell was over. A subsequent

cure notice by Honeywell would have been a meaningless gesture, regardless of whether Solitron had justifiably or unjustifiably terminated performance.

Of course, to the extent that Solitron's termination was justified, any claim by Honeywell based on the termination itself would be without merit. Of the four counts in Honeywell's counterclaim, only the fourth is based on Solitron's allegedly wrongful repudiation of the subcontract. Even as to that count, however, summary judgment is improper because Honeywell's affidavits raise a genuine issue as to whether Solitron's June 27 repudiation of the subcontract was in fact justified.

could not additionally recover under the subcontract.

We agree with the district court's holding. The Sponsorship Agreement is properly viewed as a settlement of Solitron's defective specifications claim against Honeywell. As noted above, the specifications originally came from NSA and were passed on to Solitron by Honeywell. Thus, as matters stood before Solitron and Honeywell entered into the Sponsorship Agreement, Solitron had a claim against Honeywell, and Honeywell had a claim against NSA. Pursuant to the Sponsorship Agreement, Honeywell agreed to allow Solitron to pursue the claim in Honeywell's name, thereby enabling Solitron to negotiate directly with NSA. In exchange, Solitron agreed not to pursue its claim against Honeywell. As stated in paragraph 18 of the Sponsorship Agreement, once Solitron had negotiated a settlement with NSA and received payment, it would "have no right of further action whatsoever in connection with the subject matter of its claim."

It is an established principle that "one who agrees to settle his claim cannot seek both the benefit of the settlement and the opportunity to continue to press the claim he agreed to settle." *Kirby v. Dole*, 736 F.2d 661, 664 (11th Cir.1984); *see also Strozier v. General Motors Corp.*, 635 F.2d 424, 426 (5th Cir. Unit B Jan. 1981).[5] Here, Solitron obtained the benefit of its settlement with Honeywell when the district court granted Solitron summary judgment on Count I of its complaint. That being so, Solitron cannot continue to press Count II, which seeks recovery under the subcontract for the same claim for which Solitron has obtained satisfaction through the Sponsorship Agreement. The district court therefore properly granted Honeywell's motion for judgment on the pleadings as to Count II.

### IV.

In summary, we hold that the district court erred in granting Solitron's motion for summary judgment on Honeywell's counterclaim. We further hold that the district court properly granted Honeywell's motion for judgment on the pleadings as to Count II of Solitron's complaint.

AFFIRMED in part, VACATED in part, and REMANDED.

**5.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.