[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
06/07/99
THOMAS K. KAHN
CLERK

No. 96-5262

D.C. Docket No. 92-CV-489-SH

TAMIAMI PARTNERS, LTD.
by and through TAMIAMI DEVELOPMENT
CORP., its general partner,

Plaintiff-Appellee,

versus

MICCOSUKEE TRIBE OF INDIANS OF
FLORIDA; BILLY CYPRESS; JASPER
NELSON; JIMMIE BERT; MAX BILLIE;
HENRY BERT; and DEXTER LEHTINEN,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(June 7, 1999)**

Before TJOFLAT and BIRCH, Circuit Judges, and RONEY, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This case, which is making its third appearance before our court,[1] is the result of a protracted contractual dispute between the Miccosukee Tribe of Indians of Florida ("the Tribe") and Tamiami Partners, Ltd. ("Tamiami"). The most recent incarnation of this dispute is Tamiami's second amended complaint against the Tribe as well as against the Tribe's attorney and several officers of the Tribe's Business Council and Gaming Agency (collectively, the "individual defendants"). In the district court, all of the defendants filed motions to dismiss Tamiami's second amended complaint on the following grounds: lack of subject matter jurisdiction, sovereign immunity, and failure to state a claim. The defendants bring this interlocutory appeal from the district court's order denying their motions. Because of this procedural posture, we consider only the issues of subject matter jurisdiction and sovereign immunity. With one minor exception, see infra part III.B., we affirm the district court's order on these issues with respect to the Tribe. As to the individual defendants, however, we hold

---

[1] The dispute between these parties has not been confined solely to federal court. See, e.g., Cypress v. Tamiami Partners, Ltd., 662 So. 2d 1292 (Fla. 3d DCA 1995) (quashing discovery order on basis of sovereign immunity); Mandel v. Miccosukee Tribal Gaming Agency, No. CV 93-18, 22 Indian L. Rep. 6148 (Miccosukee Tribal Ct. Jan. 31, 1994) (affirming denial of gaming license applications by Gaming Agency); In re Conservatorship for Miccosukee Indian Bingo, No. CV 93-11 (Miccosukee Tribal Ct. Apr. 13, 1993) (enforcing Gaming Agency order appointing conservator); Miccosukee Tribe of Indians v. Tamiami Partners, Ltd., No. CV 92-07 (Miccosukee Tribal Ct. July 16, 1992) (directing parties to arbitrate their disputes).

2

that the doctrine of Ex parte Young does not allow Tamiami to defeat their claims of sovereign immunity.

## I.

## A.

Because our prior opinions discuss the facts and initial procedural history of this case in detail, we provide only a summary here.[2] On April 7, 1989, the Tribe entered into a Management and Economic Development Agreement (the "Agreement") with Tamiami Development Corporation ("TDC") to operate a bingo gaming facility on Tribal lands under a gaming scheme authorized by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721 (1994), and a 1985 tribal ordinance. The Agreement had a seven-year term and was renewable by TDC, at its option, for an additional three years. In exchange for forty percent of the facility's monthly "net revenues," TDC agreed to purchase a parcel of real estate (outside the

---

[2] Most of the facts we recite in part I are drawn from the record in this case and from our prior opinions. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030 (11th Cir. 1995); Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 999 F.2d 503 (11th Cir. 1993). We occasionally draw upon the allegations in Tamiami's second amended complaint, which we accept as true in reviewing the defendants' motions to dismiss. See Jackson v. Okaloosa County, 21 F.3d 1531, 1534 (11th Cir. 1994).

Miccosukee reservation), convey the parcel to the United States in trust for the Tribe, and then design, construct, and manage a bingo facility on that parcel.

Two provisions of the Agreement are particularly relevant here. Article 12 provides that "[a]ll disputes, controversies and/or claims arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration . . . ." Under Article 23 of the Agreement, the Tribe waived its common-law immunity from a suit brought by TDC either to compel arbitration under Article 12 or to enforce an arbitration award. Article 23 states:

> The [Tribe] waives its sovereign immunity from suit as expressly provided in this Article. The United States District Court for the Southern District of Florida, shall have jurisdiction over the parties hereto in order to enforce the terms hereof specifically, upon one or both of the following events (i) [the Tribe] fails to participate in an arbitration proceeding invoked as provided in Article 12, or (ii) failure by [the Tribe] to abide by the terms of an arbitration award. . . . This waiver of sovereign immunity shall not become effective until [TDC] has given written notice to the Miccosukee Tribal Business Council, detailing the nature of the complaint and the [Tribe] shall have failed after 30 days following such notice to cure such complaint.

After the Agreement was approved by a designee of the Secretary of the Interior, TDC purchased the parcel and began to construct the bingo facility. On January 23, 1990, with the Secretary's approval, the parties effected a novation of the Agreement in order to substitute Tamiami – a Florida limited partnership of which TDC was the general partner – for TDC. Thereafter, Tamiami completed the facility

4

and began operating it as Miccosukee Indian Bingo ("MIB") in September 1990. On August 9, 1991, the Tribe adopted an ordinance establishing a Tribal Gaming Agency to oversee the registration and licensing of the managers and key employees of its gaming enterprises, including the facility managed by Tamiami. Under this ordinance, the denial of a license would result in termination of employment and eviction from the gaming facility.

During the first sixteen months of MIB's operation, the Tribe made two separate offers to purchase Tamiami's interest in the facility. The highest offer was for an amount equal to Tamiami's initial investment in the facility. Tamiami rejected both offers. On January 28, 1992, the Tribe notified Tamiami by letter that the Agreement had been "terminated by action of the [Tribe's] Business Council . . . effective 30 days from the date hereof, because of repeated and flagrant violations of the letter and spirit of that Agreement." On February 25, pursuant to Article 12 of the Agreement, Tamiami formally demanded arbitration "to determine the validity of the Tribe's purported notice of termination." The Tribe responded by filing a "Statement of Claim" in Miccosukee Tribal Court to obtain a declaration that the Agreement had been terminated. On February 27, Tamiami initiated this lawsuit by filing its original verified complaint against the Tribe in the United States District Court for the Southern District of Florida. This complaint sought a declaratory judgment that

Article 12 of the Agreement bound the Tribe to settle all disputes by arbitration, as well as an injunction compelling the Tribe to arbitrate the termination dispute and preventing it from taking control of MIB pending the completion of such arbitration.

On March 5, 1992, the district court issued its first "omnibus order" in the case. As a threshold matter, the court determined that it had subject matter jurisdiction because the case presented the question of Tribal Court power over a non-Indian. It stayed further proceedings in the case, however, pending either the parties' exhaustion of their remedies in the Tribal Court or any action by the Tribe to evict or otherwise impede Tamiami from operating MIB. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 788 F. Supp. 566 (S.D. Fla. 1992).

On July 16, 1992, the Tribal Court issued a ruling that directed the parties to initiate arbitration proceedings in accordance with the Agreement. During that same month, the Tribe denied seventeen license applications that Tamiami employees had submitted to the Tribal Gaming Agency. Tamiami responded by filing a motion asking the district court to enjoin the Tribe from exercising self-help in order to terminate the Agreement. Tamiami alleged in its motion that the Tribe, under the pretext of issuing legitimate license denials, was engaging in self-help in order to prevent Tamiami from operating MIB and thus effectively terminate the Agreement. In its second omnibus order, issued on August 19, the district court addressed this

motion. The court found that the Tribe's licensing process was arbitrary and capricious under the Administrative Procedure Act. Nevertheless, the court concluded that Congress, in enacting IGRA, had made no provision for suits by management contractors (such as Tamiami) to challenge a Tribe's licensing procedures. Moreover, it held that the Tribe's narrow waiver of sovereign immunity did not constitute consent to federal court suits challenging its licensing process. For these reasons, the court denied Tamiami's motion. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 803 F. Supp. 401 (S.D. Fla. 1992).

On August 21, Tamiami moved the district court for leave to file a "supplemental" complaint and for a preliminary injunction that would compel arbitration of the licensing dispute and prevent the Tribe from using the licensing process to frustrate Tamiami's operation of MIB. The court denied this motion on September 15. Thereafter, Tamiami took interlocutory appeals from the district court's August 19 and September 15 orders.

An arbitration panel eventually was convened on December 17, 1992. On April 13, 1993, while the interlocutory appeals and arbitration were pending, the Tribe took several steps to oust Tamiami from MIB. The Tribal Gaming Agency denied licenses to Tamiami, TDC, and two of TDC's principal officers – Cye Mandel and John Sisto. The Gaming Agency also appointed a conservator to take control of MIB and to

operate the facility; the conservator was instructed to pay the Tribe its share of MIB's net revenues and to deposit Tamiami's forty percent share into a trust account at Jefferson National Bank in Miami, Florida. The Tribal Court ratified the conservator's appointment the same day. The Tribal police then forced Mandel and Sisto to leave the MIB premises, the MIB accountant surrendered MIB's financial records to the Tribe, and the Tribe began the process of obtaining control of MIB's bank accounts.

Tamiami immediately returned to the district court seeking an injunction to prevent the Tribe from exercising self-help. In its third omnibus order, issued on April 15, the district court found that the Tribal Court had exceeded its jurisdiction in ratifying the conservator's appointment. The court also concluded that the Tribe had exceeded its sovereign powers in rejecting the license applications of Tamiami, TDC, Mandel, and Sisto. In its view, these rejections were simply an attempt to circumvent the ongoing arbitration and to terminate the Agreement. Accordingly, the court declared that all of the Tribe's April 13 actions were void and ordered the parties to return to the status quo ante of April 12. The court certified its order under 28 U.S.C. § 1292(b) (1994) to allow the Tribe to appeal. We permitted the Tribe's appeal and consolidated it with Tamiami's two pending interlocutory appeals.

On August 16, 1993, a panel of this court decided these three appeals. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 999 F.2d 503 (11th Cir. 1993) [hereinafter Tamiami I]. Addressing the subject matter jurisdiction of the district court, the panel applied the "well-pleaded complaint rule"[3] and held that Tamiami's complaint failed to state a federal question within the meaning of 28 U.S.C. § 1331 (1994). See Tamiami I, 999 F.2d at 506-07. The panel recognized that "[t]he right to be protected against an unlawful exercise of tribal court judicial power is . . . a claim arising under federal law," id. at 507, but stated that Tamiami's complaint failed to assert such a right. Instead, the complaint merely invoked section 1331 and then "present[ed] facts establishing a breach of contract claim." Id. Accordingly, the panel reversed the district court's third omnibus order and remanded the case with the following instructions:

> Because we are now aware of facts which suggest that the district court could have [subject matter] jurisdiction if the case arose today, we remand the case to the district court with directions that the district court dismiss this action unless one of the present parties files a complaint or other pleading which properly alleges jurisdiction.

Id. at 508.

---

[3] Under the well-pleaded complaint rule, a case does not raise an issue of federal law "unless a federal question is presented on the face of the plaintiff's complaint." Kemp v. International Bus. Machs. Corp., 109 F.3d 708, 712 (11th Cir. 1997).

B.

On remand, Tamiami accepted the panel's invitation by filing an amended complaint on September 14, 1993. This complaint essentially presented three claims.[4] First, Tamiami asserted a breach of contract claim against the Tribe. It alleged that the Tribe, operating through its Business Council and Gaming Agency, breached the Agreement by taking control of MIB and ousting Tamiami from the premises. Such actions, according to Tamiami, violated IGRA and exceeded the sovereign powers accorded to the Tribe under federal law. As a remedy for these violations, Tamiami sought an injunction restoring its position as the MIB operator and requiring the Tribe to pay Tamiami its forty percent share of MIB's net revenues.

In its second claim, Tamiami contended that the Tribe, acting through its Gaming Agency, abused the licensing authority conferred by IGRA and its associated regulations by refusing to license Tamiami, TDC, Mandel, and Sisto. Tamiami therefore sought an order declaring that such abuses had occurred and enjoining the Gaming Agency to issue the requested licenses. Tamiami's third claim, which also

---

[4] This court gleaned these three claims from a fair reading of the complaint. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1046-47 (11th Cir. 1995). In addition to these claims, Tamiami further contended that the Miccosukee Tribal Court and its judges had exceeded their jurisdiction and sought to have the Tribal Court's actions of April 13, 1993, declared invalid. Because this court later declared these claims against the Tribal Court and its judges to be moot, see id. at 1044, 1046 n.57, we do not discuss them further here.

10

pertained to the licensing authority conferred by IGRA and its regulations, was brought against individual members of the Tribe's Business Council and Gaming Agency. According to Tamiami, because these individuals were executing the Tribe's plan to assume control of MIB by refusing to license Tamiami's key personnel, they were subject to suit under IGRA in the district court. As to these defendants, Tamiami sought an injunction ordering them to grant the licenses at issue, restore Tamiami to the MIB premises, and turn over its share of the net revenues.

Meanwhile, the arbitration between the parties was proceeding and the arbitration panel had scheduled a final hearing for September 23. On September 15, the Tribe filed a motion in Tribal Court requesting a stay of arbitration proceedings. The court granted the stay on the following day. On September 21, the arbitration panel concluded that it derived its authority from Article 12 of the Agreement and that the Miccosukee Tribal Court had no jurisdiction to enforce that article. The panel therefore proceeded to hold its final hearing as scheduled, albeit without the participation of the Tribe or its chosen arbitrator. On October 6, a majority of the panel issued a decision in which it found that the Tribe had violated the Agreement by terminating Tamiami's MIB program director after denying his application for a gaming license. The panel awarded Tamiami fees and costs, and gave the Tribe a

11

choice between reinstating Tamiami as manager of MIB or paying Tamiami $9.5 million in satisfaction of the Tribe's obligations under the Agreement.

On October 12, 1993, the Tribe again restructured the management of MIB by terminating the conservator. At the Tribe's direction, the conservator withdrew Tamiami's share of net revenues from the trust account at Jefferson National Bank; he received those funds in the form of a cashier's check for approximately $1,566,000 that was made payable to "Dexter Lehtinen, trustee." Lehtinen, the Tribe's legal counsel, then endorsed the check over to the Tribe for deposit in a separate account at Jefferson National Bank entitled "Miccosukee Indian Bingo Reserve Account." The district court froze this separate account on October 27.

Also on October 12, the defendants filed motions to dismiss Tamiami's amended complaint on the grounds of lack of subject matter jurisdiction, sovereign immunity, and failure to state a claim. The district court ruled on these motions on February 28, 1994. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 898 F. Supp. 1549 (S.D. Fla. 1994). The court began by holding that Tamiami's amended complaint raised a federal question – "namely, whether these defendants exceeded tribal powers in their actions towards [Tamiami]." Id. at 1560. Turning to the issue of sovereign immunity, the court concluded that Tamiami's claims against the Tribe and its Business Council and Gaming Agency were barred because the Tribe had not

clearly waived its immunity and Congress had not abrogated it. Accordingly, the court dismissed these claims with prejudice. With regard to the individual defendants, however, the court – applying the doctrine of Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908) – held that the Tribe's sovereign immunity did not shield the individual defendants given Tamiami's allegation that they had "acted beyond the authority that the Tribe is capable of bestowing upon them under federal laws defining the sovereign powers of Indian tribes." Id. at 1561-62. The court therefore denied the individual defendants' motions to dismiss.

The individual defendants appealed the portion of the district court's order rejecting their claims of tribal sovereign immunity. After the district court entered final judgment on Tamiami's claims against the Tribe and its associated entities, Tamiami appealed that judgment. A second panel of this court consolidated these appeals and issued an opinion on August 16, 1995. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030 (11th Cir. 1995) [hereinafter Tamiami II].

As to the subject matter jurisdiction of the district court, the panel held that each of Tamiami's three claims presented a federal question. Tamiami's claim that the Tribe had breached the Agreement, according to the panel, was essentially a claim that the Tribe – acting through its Gaming Agency – had violated IGRA and its associated

13

regulations (which the Agreement incorporated) by failing to process Tamiami's license applications in good faith with the sole purpose of taking over MIB. Thus, Tamiami's arguments that IGRA imposed an obligation to process license applications in good faith and that the Tribe violated this obligation presented a federal question. The panel also concluded that Tamiami's second and third claims, which were based directly on IGRA and the regulations, presented federal questions. See id. at 1047.

Turning to the issues of sovereign immunity and failure to state a claim, the panel examined Tamiami's first and second claims against the Tribe. It agreed with the district court's conclusion that Tamiami's first claim was barred by the Tribe's sovereign immunity, which Congress had not abrogated and the Tribe had not clearly waived. Although Article 23 of the Agreement did provide a waiver for the limited purposes of compelling the Tribe to arbitrate or enforcing an arbitration award, the panel found that Tamiami's first claim – "simply a breach of contract claim for which it seeks money damages and injunctive relief," id. at 1048 – did not seek the type of relief contemplated by that waiver. In footnote 66, which appeared at the end of its discussion of Tamiami's first claim, the panel offered the following comment:

> Tamiami's original complaint sought an order compelling the Tribe to submit to arbitration; its amended complaint, however, does not seek that relief. Tamiami remains free, of course, to seek enforcement in the district court of the October 6, 1993 arbitration award and to seek an order in the district court compelling arbitration of any remaining contract disputes.

14

Id. at 1048 n.66. As to Tamiami's second claim alleging violations of IGRA and the regulations, however, the panel did not agree that it was barred by the Tribe's sovereign immunity. Rather, it "dispose[d] of that claim on the separate ground that, because IGRA provides Tamiami no right of action, Tamiami has failed to state a claim for relief." Id. at 1048.

Finally, the panel considered Tamiami's claim against the individual defendants. It found that the district court's denial of the individual defendants' motions to dismiss on the ground of Tribal sovereign immunity was immediately appealable under the Cohen collateral order doctrine. See id. at 1050; see also Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47, 69 S. Ct. 1221, 1225-26, 93 L. Ed. 1528 (1949). The panel then proceeded to affirm the district court's ruling, under the doctrine of Ex parte Young, that the individual defendants were not shielded by the Tribe's sovereign immunity. It declined to decide, however, whether Tamiami could state a claim for relief against the individual defendants. See id. at 1051 & n.72.

## C.

On remand, the district court granted Tamiami's motion to file a second amended complaint – the pleading now before us. This complaint, which Tamiami

15

filed on November 17, 1995, contains six counts and names as defendants the Tribe, individual members of the Tribe's Business Council and Gaming Agency (Billy Cypress, Jasper Nelson, Jimmie Bert, Max Billie, and Henry Bert), and the Tribe's legal counsel, Dexter Lehtinen. The first count essentially requests two types of declaratory relief: (a) a declaration that all disputes between Tamiami and the Tribe that arise out of or relate to the Agreement – including the licensing dispute – are arbitrable; and (b) a declaration against all of the defendants that the funds in the frozen account belong solely to Tamiami. The second and third counts request a judgment requiring the Tribe to comply with the October 1993 arbitration award and compelling the Tribe to arbitrate certain other disputes arising out of or related to the Agreement.

In the fourth count, Tamiami seeks an injunction against the Tribe in the form of an order directing the individual members of the Business Council and Gaming Agency to rescind their orders of April 13 and October 12, 1993 – which converted Tamiami's share of MIB's net revenues to the Tribe – and return the funds in the frozen account to Tamiami. The fifth count is a conversion claim against Billy Cypress, Chairman of the Tribe, and Dexter Lehtinen. In this count, Tamiami contends that Cypress and Lehtinen caused to be converted to the Tribe certain sums rightfully belonging to Tamiami, including the $1.5 million in the frozen Jefferson

16

National Bank trust account and a $50,000 advance that was in the custody of the conservator as of April 13, 1993. As a result of this conversion, Tamiami requests compensatory damages "in excess of $1.5 million." The sixth count requests that the court order all defendants to make an accounting to Tamiami for the funds taken from the frozen account and for MIB's revenues since October 1993. In addition, Tamiami seeks a judgment imposing a constructive trust over its forty percent share of MIB's net revenues, the funds in the frozen account, and the $50,000 advance, as well as an order requiring the defendants immediately to pay these sums to Tamiami.

On December 4 and 5, all of the defendants filed motions to dismiss Tamiami's second amended complaint on the following three grounds: lack of subject matter jurisdiction, sovereign immunity, and failure to state a claim.[5] The district court denied these motions in a memorandum opinion and order dated September 27, 1996. In its brief opinion, the court found that the first three counts of Tamiami's complaint were predicated on the arbitration clause of the Agreement. Referring to the Tamiami II panel's comments in footnote 66, it concluded that the Eleventh Circuit had contemplated the assertion of such arbitration claims on remand. The court therefore

---

[5] Certain defendants included a fourth ground for dismissal, namely that Tamiami had waived its contractual right to arbitration under the Agreement. This waiver argument, however, is an affirmative defense, see Fed. R. Civ. P. 8(c); it is not a ground upon which Tamiami's complaint could be dismissed. Therefore, we do not consider the issue of waiver here.

rejected the defendants' arguments as to those claims. Turning to counts four through six, the court found that it had supplemental jurisdiction to consider the state law claims asserted therein. The court also rejected "the individual defendants' invocation of sovereign immunity as to the claims asserted against them, pursuant to its prior analysis under the doctrine of Ex parte Young, which was affirmed by the Eleventh Circuit." This appeal followed.

## II.

The defendants urge us to find that the district court erred in rejecting each of the three grounds upon which they based their motions to dismiss. Because this is an interlocutory appeal from the district court's denial of the defendants' motions, however, we must exercise care in determining which of these three issues are presently before us for review.

We have no doubt that the issue of subject matter jurisdiction is before us. As a threshold matter, we have a special obligation to satisfy ourselves not only that we have jurisdiction over this appeal, but also that the district court had jurisdiction over the various counts of Tamiami's complaint. See Steel Co. v. Citizens for a Better

Env't, 523 U.S. 83, —, 118 S. Ct. 1003, 1012-13, 140 L. Ed. 2d 210 (1998).[6] "[When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, 106 S. Ct. 1326, 1331, 89 L. Ed. 2d 501 (1986) (alterations in original) (quoting United States v. Corrick, 298 U.S. 435, 440, 56 S. Ct. 829, 832, 80 L. Ed. 1263 (1936)). Thus, it is appropriate for us initially to consider whether the district court erred in finding that it had subject matter jurisdiction over Tamiami's complaint. Cf. In re Sealed Case, 131 F.3d 208, 210-12 (D.C. Cir. 1997) (considering issue of subject matter jurisdiction before addressing issue that qualified for interlocutory appeal under collateral order doctrine).

The issue of sovereign immunity is also properly before us. Under 28 U.S.C. § 1291 (1994), we have "jurisdiction of appeals from all final decisions of the district courts . . . , except where a direct review may be had in the Supreme Court." The Cohen collateral order doctrine gives a "practical construction" to this final decision rule by permitting appeals "from a small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" Swint v. Chambers

---

[6] This obligation applies to every appeal; it is "inflexible and without exception." Id. at —, 118 S. Ct. at 1012 (quoting Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382, 4 S. Ct. 510, 511, 28 L. Ed. 462 (1884)).

County Comm'n, 514 U.S. 35, 42, 115 S. Ct. 1203, 1208, 131 L. Ed. 2d 60 (1995) (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S. Ct. 1221, 1225-26, 93 L. Ed. 1528 (1949)). This small category of immediately appealable decisions "includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." Id. As the panel recognized in Tamiami II, 63 F.3d at 1050, the district court's denial of sovereign immunity to the defendants falls within this category.

Regarding the issue of whether Tamiami has failed to state a claim, the defendants ask us to exercise pendent appellate jurisdiction on the theory that this issue is "inextricably intertwined" with the issue of sovereign immunity.[7] In accordance with the Supreme Court's suggestion in Swint, 514 U.S. at 51, 115 S. Ct. at 1212, we have previously recognized that pendent appellate jurisdiction over related claims "may be appropriate when a nonappealable decision is 'inextricably intertwined' with an appealable decision or when 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" United States v. Lopez-Lukis, 102 F.3d 1164, 1167 n.10 (11th Cir. 1997) (exercising such jurisdiction). In this case,

_____

[7] The defendants do not – and could not – rely upon either Cohen or 28 U.S.C. § 1292 (1994) as a basis for their contention that we have jurisdiction to consider the issue of whether Tamiami has failed to state a claim.

however, a brief overview of the defendants' specific contentions suffices to demonstrate that the issue of whether Tamiami has failed to state a claim is not in fact inextricably intertwined with the issue of sovereign immunity.[8] The defendants argue that Tamiami has failed to state a claim because counts one through three of its complaint rely on certain provisions of IGRA that do not apply to the Agreement and provide no cause of action, and because counts four through six are duplicative prayers for relief that state no claim under either federal or state law. Plainly, these arguments are wholly unrelated to the defendants' contentions that Tamiami's claims against the Tribe do not fall within the Tribe's waiver of sovereign immunity and that the individual defendants are not amenable to suit under the doctrine of Ex parte Young. Therefore, we decline to exercise pendent appellate jurisdiction over the issue of failure to state a claim; we consider only whether the district court had subject matter jurisdiction and whether the Tribe and the individual defendants were shielded by sovereign immunity.

---

[8] We are aware of, and unimpressed by, the defendants' assertion that the Tamiami II panel has inextricably intertwined these issues. According to the defendants, the panel did so by deciding that the individual defendants were amenable to suit under Ex parte Young and then refusing to reach the issue of whether Tamiami could state a claim against them. See Tamiami II, 63 F.3d at 1051 n.72. If anything, this discussion indicates that the panel did not view these issues as inextricably intertwined.

21

III.

A.

The issue of whether the district court had subject matter jurisdiction over Tamiami's complaint is a question of law subject to de novo review. See Tamiami I, 999 F.2d at 506. We begin our review with the defendants' contention that the first three counts of Tamiami's complaint do not state a federal question. See 28 U.S.C. § 1331 (1994). According to the defendants, these counts merely address contract and arbitration disputes arising under the Agreement. They argue that such disputes do not raise a federal question and that the statement in Article 23 of the Agreement that the district court "shall have jurisdiction" over the parties cannot change this result.

The defendants are correct in part. It is well-settled that parties cannot create subject matter jurisdiction by agreement. See Love v. Turlington, 733 F.2d 1562, 1564 (11th Cir. 1984). In addition, the mere fact that a dispute concerns a contract or an agreement to arbitrate, without more, does not raise a federal question. See Tamiami I, 999 F.2d at 507 (holding that the presentation of facts establishing a breach of contract claim does not state a federal question); Merrill Lynch, Pierce,

22

Fenner & Smith, Inc. v. Haydu, 637 F.2d 391, 395 (5th Cir. Unit B Feb. 1981)[9] (noting that the Federal Arbitration Act alone is insufficient to confer federal jurisdiction over disputes involving arbitration agreements, and that an independent basis of jurisdiction – such as diversity or a federal question – is required).  In this case, however, we find that the first three counts of Tamiami's complaint present more than a mere dispute concerning a contract or an agreement to arbitrate.  Each of these counts – at least in part – concerns the arbitration of Tamiami's claims that the Tribe had an obligation under the Agreement to process the gaming license applications of Tamiami and its key employees in good faith, and that the Tribe breached its obligation when it rejected these license applications for the sole purpose of taking over MIB.[10]  These very same claims were before this court in Tamiami II, albeit in

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[10] Specifically, one portion of the first count requests a declaration "that disputes between the parties to the Agreement regarding the licensing of [Tamiami] and its principals [are] arbitrable."  The second count requests enforcement of the October 1993 arbitration award, which addressed the termination of Tamiami's MIB program director following the denial of his gaming license application by the Tribe. The third count seeks to compel the Tribe to arbitrate certain additional disputes, including Tamiami's claims "that the Tribe breached the Agreement by failing to process the applications of [Tamiami's] managers and key employees in good faith; [and] that the Tribe . . . abused its licensing authority and rejected [Tamiami] applications for the sole purpose of taking over MIB."

23

the context of a direct breach of contract suit against the Tribe. The Tamiami II panel concluded that these claims arose under federal law because the Agreement incorporated – by operation of law if not by reference – the provisions of IGRA and its associated regulations regarding licensing procedures. See Tamiami II, 63 F.3d at 1047. Because federal law is equally implicated when these claims are presented in the arbitration context,[11] we must follow the Tamiami II panel's conclusion here.[12]

---

[11] The Federal Arbitration Act empowers a district court to issue an order compelling arbitration if the court, "save for [the arbitration] agreement, would have jurisdiction under title 28, in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties." 9 U.S.C. § 4 (1994). Thus, it is appropriate for us to "look through" Tamiami's arbitration request at the underlying licensing dispute in order to determine whether Tamiami's complaint states a federal question.

[12] Rather than looking to Tamiami II, the defendants assert that Tamiami's current (second amended) complaint asks for the same relief that was held not to provide a basis for federal question jurisdiction in Tamiami I. This assertion is simply incorrect. The original verified complaint that was before the Tamiami I panel sought, inter alia, an injunction compelling the Tribe to arbitrate the dispute arising from its initial attempt to terminate the Agreement by letter. Because the subsequent licensing dispute between the parties had not yet arisen when the verified complaint was filed, that complaint understandably made no allegations and requested no relief regarding the licensing dispute. It is this licensing dispute – not the earlier termination dispute – that provides a basis for exercising federal question jurisdiction over Tamiami's current complaint.

We are aware that Tamiami's "supplemental" complaint, which the district court declined to entertain on September 15, 1992, included allegations regarding the Tribe's initial license denials and requested an order compelling the Tribe to arbitrate the licensing dispute. The Tamiami I panel, however, had no jurisdiction to consider this version of Tamiami's complaint. See Tamiami II, 63 F.3d at 1043 n.44.

24

We hold, therefore, that the first three counts of Tamiami's complaint state a federal question insofar as they relate to the Tribe's rejection of gaming license applications. The portions of these counts that do not relate to gaming licenses are plainly within the supplemental jurisdiction of the district court; the defendants do not contend otherwise.

The defendants do contend, however, that the district court lacked the power to exercise supplemental jurisdiction over counts four through six of Tamiami's complaint. Under 28 U.S.C. § 1367(a) (1994), a district court that has original jurisdiction in a civil action "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." In other words, a district court has the power to exercise supplemental jurisdiction over all claims that "arise out of a common nucleus of operative fact with a substantial federal claim." Lucero v. Trosch, 121 F.3d 591, 597 (11th Cir. 1997).

We readily conclude that Tamiami's federal claims regarding the Tribe's gaming license denials are sufficiently substantial to support supplemental jurisdiction. Neither we nor the defendants have discovered any "prior decisions [that] inescapably render the claims frivolous." See L.A. Draper & Son v.

25

Wheelabrator-Frye, Inc., 735 F.2d 414, 427 (11th Cir. 1984) (quoting Jackson v. Stinchcomb, 635 F.2d 462, 471 (5th Cir. Jan. 1981)). As to whether these substantial federal claims share a common nucleus of operative fact with Tamiami's claims in counts four through six, the defendants offer two reasons why they do not. First, the Tribe and its officials argue that no common nucleus exists because Tamiami's federal claims are against the Tribe while its remaining claims are against the individual defendants. This argument is both factually and legally incorrect. As a factual matter, our discussion of Tamiami's second amended complaint reveals that counts four and six are against both the Tribe and the individual defendants. See supra part I.C. In addition, it is clear from section 1367 itself that the parties to the federal and supplemental claims need not be identical in order for supplemental jurisdiction to lie. See 28 U.S.C. § 1367(a) ("Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

Second, defendant Lehtinen argues that a common nucleus is lacking as to counts five and six because the facts that bear upon the state-law claims asserted in those counts are separate and distinct from the facts that are relevant to the resolution of Tamiami's federal claims. Specifically, Lehtinen asserts that the facts necessary to prove conversion and constructive trust under state law concern the actions of the individual defendants regarding certain funds (such as those in the frozen account),

26

while the facts necessary to the resolution of Tamiami's federal claims concern the arbitration provisions of the Agreement between Tamiami and the Tribe. Because the success of Tamiami's federal claims does not depend on the success of its state-law claims, he argues, supplemental jurisdiction over the state-law claims is unavailable. We find Lehtinen's conception of supplemental jurisdiction to be unduly narrow. In our view, both Tamiami's federal claims and its claims in counts four through six seek to remedy the injury that Tamiami suffered when the Tribe terminated the Agreement through a series of actions by the individual defendants. In its second amended complaint, Tamiami made a strategic decision to attack this termination in two ways: (1) in the first three counts, Tamiami attacked the Tribe's method of terminating the agreement by seeking to arbitrate its federal claim that the Tribe denied its license applications in bad faith in order to take over MIB; and (2) in counts four through six, Tamiami attacked the result of this termination by seeking to recover its forty percent share of MIB's net revenues from the Tribe and the individual defendants. This strategic decision, however, did not catalyze some mysterious fissile process that split the sphere of operative facts surrounding the termination dispute into two separate nuclei. Thus, the district court had the power to exercise supplemental jurisdiction over counts four through six of Tamiami's complaint.

B.

We now turn to the district court's ruling that the Tribe's sovereign immunity does not shield the Tribe and the individual defendants from suit. The issue of a sovereign's immunity from suit is a question of law that we review de novo. See Tinney v. Shores, 77 F.3d 378, 383 (11th Cir. 1996).

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S. Ct. 1670, 1677, 56 L. Ed. 2d 106 (1978). Tamiami's claims against the Tribe itself are therefore "barred by the doctrine of sovereign immunity unless the Tribe, by the very act of entering into the [Agreement] and engaging in the gaming enterprise, waived its immunity from suit by Tamiami or Congress, by enacting IGRA, abrogated that immunity." Tamiami II, 63 F.3d at 1048. Although we concluded in Tamiami II that IGRA did not purport to abrogate the sovereign immunity of tribes that engage in bingo gaming, we also found that the Tribe partially waived its immunity in Article 23 of the Agreement. See id. The Tribe contends that Tamiami's claims against it in the second amended complaint do not fall within the scope of this waiver.

Under Article 23 of the Agreement, the Tribe waived its immunity from a suit brought by Tamiami to compel arbitration or to enforce an arbitration award. See

28

supra part I.A. (quoting Article 23). To the extent that counts one (b), four, and six of the second amended complaint – which seek, respectively, a declaration that the frozen funds belong to Tamiami, an injunction compelling the return of these funds, and an accounting and the imposition of a constructive trust – are directed against the Tribe,[13] we agree that these counts do not fall within the scope of the Article 23 waiver. These counts are therefore barred and the district court erred in refusing to dismiss them as to the Tribe. Counts one (a), two, and three of the complaint, however, seek only a declaration that the disputes between Tamiami and the Tribe that arise out of or relate to the Agreement are arbitrable, a judgment requiring the Tribe to comply with the October 1993 arbitration award, and a judgment compelling the Tribe to arbitrate certain disputes arising out of or relating to the Agreement. Plainly, these counts seek the type of relief expressly contemplated by Article 23.[14] Thus, the

---

[13] Count five of the complaint is not directed against the Tribe; it seeks only to hold Cypress and Lehtinen individually liable for conversion.

[14] We read count one (a) as requesting only that the district court, prior to ordering the Tribe to arbitrate a given dispute as requested in count three, determine that Tamiami has properly invoked an arbitration proceeding as to that dispute under Article 12 of the Agreement. So read, we find that count one (a) clearly falls within the portion of the Article 23 waiver that permits the district court to "enforce the terms [of the Agreement] specifically, [in the event that the Tribe] fails to participate in an arbitration proceeding invoked as provided in Article 12."

29

district court correctly refused to dismiss these counts on the ground of sovereign immunity.

Turning to the individual defendants' claims of immunity as tribal officers,[15] we begin with the proposition that tribal officers are protected by tribal sovereign immunity when they act in their official capacity and within the scope of their authority; however, they are subject to suit under the doctrine of Ex parte Young when they act beyond their authority.[16] In Tamiami II, 63 F.3d at 1050-51, we relied on Ex parte Young in affirming the district court's ruling that the Tribe's sovereign immunity did not shield the individual defendants from Tamiami's suit. Our holding pertained to the third count of Tamiami's amended complaint, which was brought

---

[15] Each of the individual defendants claims tribal officer status; Tamiami does not dispute this claim. We therefore assume, without deciding, that all of the individual defendants – including attorney Lehtinen – were officers of the Tribe who undertook the complained-of actions in their official capacities. Cf. Stock West Corp. v. Taylor, 942 F.2d 655, 664-65 (9th Cir. 1991), modified on reh'g, 964 F.2d 912 (9th Cir. 1992) (en banc) (citing cases and discussing issue of when tribal attorney is acting as tribal official).

[16] See Fletcher v. United States, 116 F.3d 1315, 1324 (10th Cir. 1997); Tamiami II, 63 F.3d at 1050-51; Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community, 991 F.2d 458, 460 (8th Cir. 1993); Imperial Granite Co. v. Pala Band of Mission Indians, 940 F.2d 1269, 1271 (9th Cir. 1991); Tenneco Oil Co. v. Sac & Fox Tribe of Indians, 725 F.2d 572, 574-75 (10th Cir. 1984); Thompson v. Crow Tribe of Indians, 962 P.2d 577, 581-82 (Mont. 1998); cf. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59, 98 S. Ct. 1670, 1677, 56 L. Ed. 2d 106 (1978) (citing Ex parte Young and finding that a tribal officer was not protected by tribal sovereign immunity from a suit to enjoin enforcement of a tribal ordinance that allegedly violated a federal statute).

under IGRA and its regulations. This count essentially alleged that the individual defendants, by abusing the licensing authority conferred by IGRA, had acted beyond the authority that the Tribe was capable of bestowing upon them. Tamiami's claims against the individual defendants in its present (second amended) complaint, however, do not mention IGRA or licensing at all. Instead, in counts one (b) and four through six, Tamiami merely offers various theories under which the individual defendants must pay it forty percent of MIB's net revenues. In our view, these claims against the individual defendants are simply a thinly-disguised attempt by Tamiami to obtain specific performance of the Tribe's obligations under the Agreement, which allocates forty percent of MIB's net revenues to Tamiami. The doctrine of Ex parte Young may not be used in this fashion. It is well established that Ex parte Young does not permit individual officers of a sovereign to be sued when the relief requested would, in effect, require the sovereign's specific performance of a contract. See, e.g., Ex parte Young, 209 U.S. 123, 151, 28 S. Ct. 441, 450, 52 L. Ed. 714 (1908) (citing Ex parte Ayers, 123 U.S. 443, 504, 8 S. Ct. 164, 182, 31 L. Ed. 216 (1887); Hagood v. Southern, 117 U.S. 52, 67-68, 6 S. Ct. 608, 615, 29 L. Ed. 805 (1886)); MSA Realty Corp. v. Illinois, 990 F.2d 288, 294-95 (7th Cir. 1993). We hold, therefore, that the district court erred in rejecting the individual defendants' claims of sovereign immunity under the doctrine of Ex parte Young.

IV.

For the foregoing reasons, the defendants' request that we exercise pendent appellate jurisdiction over the issue of whether Tamiami's second amended complaint fails to state a claim is DENIED. On the issue of subject matter jurisdiction, the district court's denial of the defendants' motions to dismiss is AFFIRMED. On the issue of sovereign immunity, the district court's denial of the Tribe's motion to dismiss is AFFIRMED as to counts one (a), two, and three, and REVERSED as to counts one (b), four, and six. The district court's denial of the individual defendants' motions to dismiss on the ground of sovereign immunity is REVERSED. We REMAND this case to the district court for further proceedings consistent with this opinion.

IT IS SO ORDERED.